Jonathan Evans (CSB No. 247376)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Tel: (213) 598-1466
Email: jevans@biologicaldiversity.org

Allison LaPlante (OSB No. 023614)
(application for *pro hac vice* pending)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Tel: (503) 980-3408
Email: alaplante@biologicaldiversity.org

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CENTER FOR BIOLOGICAL DIVERSITY; CENTER FOR ENVIRONMENTAL HEALTH; and PESTICIDE ACTION & AGROECOLOGY NETWORK,

*Plaintiffs,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,

*Defendants.*

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Pursuant to the Clean Water Act and Administrative Procedure Act

## INTRODUCTION

1. The Center for Biological Diversity, Center for Environmental Health, and Pesticide Action & Agroecology Network (collectively, "Plaintiffs") bring suit to compel Defendants United States Environmental Protection Agency ("EPA") and EPA Administrator Lee Zeldin, in his official capacity (collectively "EPA" or "Defendants"), to establish water quality criteria, for the protection of aquatic life and human health, from the well-known and harmful effects of the herbicide atrazine.

2. Atrazine, primarily used on industrially-grown commodity crops such as corn, sugarcane, and sorghum, is the second most widely-used pesticide in the United States, with about 70 million pounds deployed nationwide each year. It is also the most widespread pesticide contaminant in U.S. waterbodies and is so dangerous to both people and wildlife that it has been banned in more than 60 countries across the world.

3. While other countries have banned atrazine outright, EPA continues to authorize its use in America, resulting in the contamination of thousands of watersheds nationwide and inflicting widespread harm to aquatic life and human health. EPA has failed to even take the most basic step of establishing standards under the Clean Water Act regarding what, if any, quantities of atrazine are safe in the nation's waters.

4. Atrazine's widespread pollution—at levels that exceed EPA's own levels of concern—justifies immediate action. Yet EPA has stalled progress for more than 25 years since it first initiated the process to set water quality criteria pursuant to the Clean Water Act in 1999. *See* 64 Fed. Reg. 58,409 (Oct. 29, 1999).

5. In doing so, EPA has violated its mandatory duty under Clean Water Act section 304(a), 33 U.S.C. § 1314(a), to issue water quality criteria for atrazine. *See also* 33 U.S.C. § 1365(a)(2); 40 C.F.R. §§ 135.2(b), 135.3(b).

6. Alternatively, EPA must be compelled to finalize atrazine criteria, because this is an agency action "unlawfully withheld or unreasonably delayed" under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(1).

7. This lawsuit seeks an order compelling EPA to propose and finalize water quality criteria for atrazine, reflecting the latest scientific knowledge, by dates certain, and other relief.

**JURISDICTION AND VENUE**

8. Plaintiffs bring this action pursuant to the Clean Water Act, 33 U.S.C. § 1365(a)(2), and the APA, 5 U.S.C. §§ 702, 706(1). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (APA review).

9. This Court has the authority to issue the requested relief pursuant to the Clean Water Act, 33 U.S.C. § 1365(a)(2), the APA, 5 U.S.C §§ 701–706, and 28 U.S.C. § 2201–2202.

10. On May 28, 2026, Plaintiffs sent EPA the required notice of intent to sue, pursuant to 33 U.S.C. § 1365(b)(1)(A). That notice of intent to sue is attached hereto as Exhibit 1.

11. Venue lies in this judicial District pursuant to 28 U.S.C. § 1391(e) because one or more Plaintiffs reside in this District and no real property is involved in the action.

**DIVISIONAL ASSIGNMENT**

12. Pursuant to Civ. L.R. 3-2(c) and 3-2(d), this action is properly assigned to either the San Francisco or Oakland Division of this Court because one or more Plaintiffs reside in and maintain offices in Alameda County.

**PARTIES**

13. Plaintiffs are public interest nonprofit organizations with missions that include reducing the harms from pesticides in our environment.

14. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a nonprofit corporation with its headquarters in Tucson, Arizona, an office in Oakland, California, offices throughout the United States, and an office in Mexico. CBD was founded in 1989 to fight the growing number of threats to biodiversity. CBD's mission is to secure a future for all species, great and small, hovering on the brink of extinction through science, policy, education, and environmental law. CBD has a full-time staff of scientists, lawyers, and other professionals who work exclusively on campaigns to save species and their habitats. CBD is actively involved in species and habitat protection issues throughout the United States, including the U.S. territories,

as well as outside of the United States and works to secure protections for all species. One of CBD's flagship programs is its environmental health program, which focuses on the adverse impacts of pesticides, including atrazine. CBD has over 101,000 members that live throughout the United States, including close to 25,000 in California. CBD's members rely on CBD to represent their interests in protecting biodiversity and conserving threatened and endangered species and their habitats.

15. Plaintiff CENTER FOR ENVIRONMENTAL HEALTH ("CEH") is a national non-profit organization organized and existing under the laws of the State of California, with its headquarters located in Oakland, California. CEH protects the public from toxic chemicals by working with communities, consumers, workers, government, and the private sector to demand and support business practices that are safe for public health and the environment. CEH works in pursuit of a world in which all people live, work, learn, and play in healthy environments.

16. For 30 years, CEH has worked to protect people and the environment from toxic chemicals by engaging with communities, consumers, workers, government, and the private sector to demand and support business practices that are safe for public and environmental health. Its work has been featured in numerous local, state, national and global news outlets. CEH engages with organizations and members of the public from the grassroots to the global level, and shares information via listservs with a large number of networks and coalitions, and through in-person and virtual events.

17. CEH has a long track record of ground-breaking consumer education and rights victories related to ingredient disclosure, consumer right to know, and corporate accountability for product reformulation, pollution controls, and the reduction in the use of toxic pesticides. Some key examples are advocating for the establishment of comprehensive federal limits on lead in children's products through the Consumer Product Safety Improvement Act, ending toxic heavy metal threats from jewelry, the elimination of chlorinated tris (or TDCPP) flame retardant chemicals from baby products, and ending lead poisoning risks from candy. In the 2026 California Legislative Session, CEH co-sponsored AB 1603 (Schultz), a bill requiring transparency in the use

of per- and polyfluoroalkyl substances (PFAS) pesticides in California. Governor Newsom signed AB 1603 into law on September 27, 2026.

18. CEH has approximately 50,000 supporters and over 100,000 social media followers across the United States. CEH is governed by a Board of Directors, the members of which are influential experts and advocates who are also supporters of CEH. CEH Board Members are actively engaged in helping to shape the direction of CEH's work.

19. Board members, supporters and staff of CEH live, work, and recreate in areas of the country where atrazine is applied and where atrazine has contaminated drinking water supplies, and thus have a strong interest in ensuring that EPA develops water quality criteria for atrazine to minimize impacts to aquatic species and their habitats, and to protect public health and the environment.

20. Plaintiff PESTICIDE ACTION & AGROECOLOGY NETWORK ("PAN") is an Emeryville, California-based, nonprofit organization with a mission to end reliance on hazardous pesticides and achieve health, resilience, and justice in food and farming. PAN was founded in 1982 to combat the proliferation of pesticide-intensive agriculture. It brings this action on behalf of itself and its members, who rely on PAN to represent their interests in protecting the environment from pesticides. For decades, PAN has worked to replace the use of hazardous pesticides with healthier, ecologically-sound pest management across the United States. PAN provides scientific expertise, public education and access to pesticide data and analysis, and policy development and coalition support to more than 100 affiliated organizations in North America. PAN has more than 32,000 members across the United States. PAN's members live, work, farm, and recreate in areas of the country where atrazine is applied, and thus have a strong interest in ensuring that EPA develops criteria for atrazine to minimize impacts to aquatic species and their habitats, and to protect public health and the environment.

21. Plaintiffs' members regularly work, reside, visit, observe, recreate, and otherwise enjoy wildlife, plants and habitats in areas across the nation that are impacted by atrazine. Plaintiffs' members regularly derive professional, aesthetic, spiritual, recreational, economic,

conservation, educational, and other benefits from the waterbodies impacted by atrazine and the species that depend on them. These members are injured by impacts to water quality and aquatic species, and will continue to be injured into the future, because of EPA's failure to adopt water quality criteria for atrazine, which could avoid or reduce harm to these species and their habitats, as well as harm to public health caused by atrazine in waterways.

22. Atrazine poses human health risks for Plaintiffs' members. It has been classified as a "probable human carcinogen" by the International Agency for Research on Cancer, is associated with aggressive prostate cancer, Non-Hodgkin lymphoma, with cancers of the pharynx and kidney, renal cell carcinoma, and ovarian cancer. Atrazine is also widely recognized as an endocrine disruptor, interfering with the hormones regulating development and reproduction, correlating with birth defects, reproductive tumors, and weight loss in amphibians as well as humans. A range of studies have demonstrated that atrazine has been linked to irregular estrogen levels and menstrual cycles, testosterone production, abnormal birth weight and timing, and unexplained infertility.

23. Plaintiffs' members are harmed by and reasonably concerned about atrazine pollution. For example, CBD member Brett Hartl is an avid birder, mammal watcher, and photographer of wildlife. He is injured by the failure to correctly address the impacts of atrazine on wildlife, such as the least Bell's vireo, southwestern willow flycatcher, and least tern. Though he resides in Arizona, he travels widely to observe and photograph birds, mammals and other wildlife in other parts of the United States, including southern Texas to observe the Whooping Crane, and Florida to observe the Florida Scrub-Jay. The failure to establish water quality criteria for atrazine diminishes his enjoyment of these species, all of which are harmed by this herbicide.

24. Another CBD member lives in the Midwest and visits areas affected by atrazine pollution. This CBD member enjoys observing and looking for wildlife such as the Whooping crane, which is adversely affected by atrazine pollution as it travels across large parts of the Midwest during migration. CBD members and their families are harmed by atrazine water pollution that is in waterbodies that they swim and recreate in, and atrazine pollution may cause

CBD members to forgo swimming and recreating in waterbodies they might otherwise enjoy. Another CBD member lives in Florida and is a wildlife photographer who enjoys wildlife adversely affected by atrazine. She is also harmed when atrazine pollution impacts her ability to enjoy recreating in and on waterways. These CBD members' aesthetic, personal, and professional interests are harmed by EPA's failure to develop water quality criteria sufficient to protect and conserve these species and waterbodies from harmful pesticides like atrazine.

25. Members of PAN are also harmed by EPA's failure to develop water quality criteria for atrazine. One PAN member is a farmer in Iowa who grows food on a farm for personal consumption and distribution while relying on agroecological principles. He draws his water from a well for watering his crops and for personal use. He is aware of the high levels of pesticide pollution in the area, including atrazine, and attempts to take steps to avoid exposure to pesticides. He is a cancer survivor and is aware that many pesticides, such as atrazine are carcinogenic. His aesthetic, personal, and professional interests are harmed by EPA's failure to develop water quality criteria sufficient to protect water supplies from levels of atrazine that pose risks to human health and the environment.

26. The above-described interests of the Plaintiffs' members have been and are being injured by EPA's failure to develop water quality criteria for atrazine for the protection of aquatic life and human health. If EPA had developed water quality criteria for atrazine based on accurate, current scientific data, states would have likely adopted those criteria. This, in turn, would have led to regulatory restrictions on activities that result in atrazine entering and contaminating waterbodies, threatening public health and harming the species Plaintiffs' members care about.

27. Unless the requested relief is granted, Plaintiffs' members' interests will continue to be adversely affected and injured by EPA's failures and delay in developing recommended criteria for atrazine. The relief sought herein—an order requiring EPA to develop proposed, and then final, atrazine criteria for the protection of aquatic life and human health—would redress the Plaintiffs' members' injuries. Plaintiffs have no other adequate remedy at law.

28. Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

("EPA") is an agency of the United States government with the responsibility for implementing the Clean Water Act.

29. Defendant LEE ZELDIN is sued in his official capacity as the EPA Administrator. He is responsible for overseeing the agency's Clean Water Act obligations, including the development of water quality criteria.

## LEGAL BACKGROUND

### The Clean Water Act

30. Congress adopted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act prohibits the discharge of pollutants to waters absent an authorization under the Act. 33 U.S.C. § 1311(a). Authorizations to discharge pollutants from point sources to navigable waters are issued under the National Pollutant Discharge Elimination System ("NPDES"), which, along with other activities authorized by the Clean Water Act, must ensure that water quality standards are not violated. 33 U.S.C. § 1311(b)(1)(C).

31. "Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses. Water quality standards are to protect the public health or welfare, enhance the quality of water and serve the purposes of the Act." 40 C.F.R. § 131(3)(i). "Such standards serve the dual purposes of establishing the water quality goals for a specific water body and serve as the regulatory basis for the establishment of water-quality-based treatment controls and strategies beyond the technology-based levels of treatment" also required by the CWA. 40 C.F.R. § 131.2.

32. Water quality standards also serve as a target for Clean Water Act restoration activities such as total maximum daily loads ("TMDLs"). Clean Water Act section 303 requires states to identify waterbodies that fail to attain water quality standards, and TMDLs must be developed and implemented for these waters. A TMDL represents the maximum amount of

pollutant loading that a waterbody can receive from all combined sources without exceeding applicable water quality standards, sometimes described as the "pollution budget." From this information, opportunities for reducing excessive loads can be identified and implemented, individual contributions can be capped, and additional loading prevented. TMDL-derived effluent limitations on pollutants of concern must be included in NPDES permits. TMDLs are also a primary mechanism for development and implementation of controls on nonpoint source pollution (unregulated by NPDES permits).

33. Water quality standards form a key legal basis for controlling pollutants entering the waters of the United States. Ensuring that waterbodies are of sufficient quality to support designated aquatic life uses (e.g., fish and shellfish spawning and rearing) is crucial to the protection of threatened and endangered aquatic species. Water quality standards have far reaching impacts, serving a critical role in the state and federal obligations under other statutes such as the Endangered Species Act.

34. EPA must publish, and from time-to-time revise, criteria for water quality under Clean Water Act section 304(a) that reflect the latest scientific knowledge. 33 U.S.C. § 1314(a). EPA's section 304(a) national criteria recommendations ("304(a) criteria") provide quantitative concentrations or levels and/or qualitative measures of pollutants that, if not exceeded, will generally ensure adequate water quality for protection of a designated use. Separate water quality criteria for a particular pollutant are typically established based on 1) human health protection, 2) recreational use standards, and 3) protection of aquatic life, as well as other common designated waterbody uses.

35. Though they are woefully outdated, EPA uses its *Guidelines for Deriving Numerical National Water Quality Criteria for the Protection of Aquatic Organisms and Their Uses* (1985) (commonly referred to as the "Aquatic Life Guidelines") to derive 304(a) criteria to protect aquatic life from the effects of toxic pollutants. EPA Office of Water, *Water Quality Standards Handbook Chapter 3: Water Quality Criteria,* at 14, Pub. EPA 823-B-17-001 (2017). The Aquatic Life Guidelines provide suggestions for the development, selection, and consideration

of scientific data to inform the derivation of aquatic life water quality criteria, as well as options and factors for consideration in the expression of such criteria.

36. Criteria are expressed in terms of magnitude (e.g., pollutant concentration limitation in water, usually a maximum concentration), frequency (e.g., how often the magnitude limit may be exceeded), and duration (e.g., how long the magnitude limit may be exceeded).

37. Water quality criteria should be numeric unless numeric criteria cannot be developed. 40 C.F.R. § 131.11(b). Once EPA proposes draft 304(a) criteria, the public and other government entities have an opportunity to comment.

38. States are primarily responsible for reviewing, establishing, and revising water quality standards, including water quality criteria. 40 C.F.R. § 131.4(a). However, every three years, states must consider any new or revised water quality criteria promulgated by EPA. 40 C.F.R. § 131.20. States must either "adopt new or revised criteria for parameters for which EPA has published new or updated Clean Water Act section 304(a) criteria recommendations," or provide an explanation to EPA that meets statutory and regulatory requirements for declining to adopt the criteria. *Id.*; 33 U.S.C. § 1313(c).

39. EPA then approves or disapproves the state's water quality standards and must promulgate new or revised water quality standards if the state's standards do not meet regulatory requirements. 33 U.S.C. § 1313(b), (c); 40 C.F.R. § 131.5(b). EPA also has the authority to promulgate water quality standards for a state "in any case where the Administrator determines that a revised or new standard is necessary to meet the requirements of [the Clean Water Act]." 33 U.S.C. § 1313(c)(4)(B).

**The Administrative Procedure Act**

40. Pursuant to the Administrative Procedure Act ("APA"), a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The APA requires that all federal agencies address matters "within a reasonable time," and "[w]ith due regard for the convenience and necessity of the parties or their representatives." 5 U.S.C. § 555(b). Where an agency action is unreasonably delayed the court shall compel the agency to act in a

reasonable time. 5 U.S.C. § 706(1).

**The Endangered Species Act ("ESA")**

41. Under section 7 of the ESA, all federal agencies shall "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ." 16 U.S.C. § 1536(a)(2).

42. The ESA establishes an interagency consultation process to assist federal agencies, such as EPA, in complying with their substantive section 7(a)(2) duty to guard against jeopardy to listed species or destruction or adverse modification of critical habitat. An agency must initiate consultation under section 7 whenever its action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). If the proposed action "may affect" and is "likely to adversely affect" listed species or their critical habitat, the federal agency must initiate formal consultation with the expert fish and wildlife agencies. 50 C.F.R. § 402.14(c).

## FACTUAL BACKGROUND

### Atrazine Is Widely Used and Dangerous

43. Atrazine is a chlorotriazine herbicide used as an active ingredient in pesticides that kill plants by inhibiting photosynthesis. Atrazine is registered for use on several agricultural crops, with the highest use on field corn, sweet corn, sorghum, and sugarcane. Atrazine's use has contaminated waterbodies, leading to widespread exposure that poses threats to ecosystems and human health.

44. Generally, atrazine varies from slightly to highly toxic to animals and can cause mortality, impairment to animals' growth and reproduction, and indirect harm from negative ecosystem impacts. Researchers have found a consistent pattern of additive and synergistic toxicity when organisms are exposed to atrazine in mixtures with other chemicals. A recent meta-analysis of 107 datasets concluded atrazine exposure is associated with increased animal mortality, with amphibians, fish, mollusks, insects, and nematodes among the most sensitive groups; animals in larval and juvenile stages showed greater susceptibility; commercial and pure formulations

resulted in high mortality rates; and atrazine and other pesticides had synergistic effects that increased the risk of mortality.

45. Multiple studies found that atrazine has a devastating effect on amphibians. One study found that chronic atrazine exposure in adult male frogs caused chemical castration and complete feminization. Another study showed that atrazine caused immunosuppression in tadpoles and was the strongest predictor of larval trematodes, a parasitic flatworm. Another study found atrazine slowed growth of American toad tadpoles. Other studies have found non-lethal but deleterious effects on growth, gonadal development, liver health, and survival even at sub-chronic exposure levels.

46. Atrazine's damaging effects extend beyond amphibians. A recent review found a range of biochemical, physiological, behavioral, and genetic alterations in fish, even at low concentrations. One study found a month-long exposure to low atrazine concentrations caused oxidative stress, liver and testis histological damage, and altered thyroid hormone ratio. Some recent studies have found that atrazine can have transgenerational effects, sometimes not manifesting until a generation after initial exposure. Similar effects were also found in invertebrates, like crayfish and mussels. Its accumulated presence in aquatic ecosystems has led to widespread, ecosystem-level harm.

47. Finally, given its use as a photosynthesis-inhibiting herbicide, atrazine's effect on plant life is unsurprising but no less devastating. One study found that atrazine inhibited photosynthesis and altered defense responses in the marine aquatic primary producers. Another study affirmed the additive and synergistic effects for such producers, noting impaired photosynthesis, energy supply, biomass, and nutritional value. Another study found that atrazine even disrupts microbe community composition, the cornerstone for many ecosystem processes in aquatic systems. Finally, one study directly connected atrazine's harmful effect on aquatic plants to other animals in the ecosystem because it alters the nutritional quality of this resource for primary consumers.

48. Atrazine has been repeatedly linked to a range of human health impacts. Atrazine

has been classified as a "probable human carcinogen" by the International Agency for Research on Cancer. Atrazine use is associated with aggressive prostate cancer and Non-Hodgkin lymphoma among those diagnosed at younger ages and with cancers of the pharynx and kidney, and soft tissue cancers were observed in lagged analyses. There is also a significant exposure–response association between atrazine use and risk of renal cell carcinoma in lagged analysis. Women previously exposed to triazines showed a significant relative risk of increased ovarian cancer.

49. Atrazine is widely recognized as an endocrine disruptor, meaning it can interfere with the hormones regulating development and reproduction, causing birth defects, reproductive tumors, and weight loss in amphibians as well as humans. Studies have demonstrated that atrazine has been linked to irregular estrogen levels and menstrual cycles, testosterone production, abnormal birth weight and timing, and unexplained infertility.

50. Analysis from the Environmental Working Group's Tap Water Database finds that atrazine is commonly detected in drinking water, especially in areas where drinking water comes from cornfield or other agricultural runoff. Atrazine has been detected in drinking water in at least 36 states, at over 2,000 utilities, serving approximately 40 million people, with 12 states having more than 1 million people exposed.

///

///

///

///

///

///

///

///




Watersheds that Exceed the EPA Level of Concern for Atrazine

51. A September 2026 report[1] released by CBD, made several key findings:

(a) Atrazine is estimated to contaminate nearly 860,000 miles of U.S. rivers at levels known to harm aquatic wildlife. This encompasses over 25% of all river and stream miles in the lower 48 states.

(b) Harmful levels of atrazine are found on more than 250 million acres, which encompass about one-eighth of the entire landmass of the continental United States.

(c) Over 20% of the country's drinking-water surface-intake facilities—which provide water for people to drink, bathe, and prepare food—source water from these highly contaminated streams. This highly contaminated area also contains at least 675,000 wells currently supplying

[1] Nathan Donley, *Pernicious Pesticide: Atrazine's Growing Threats to Drinking Water, Rivers, People, and Wildlife* (Center for Biological Diversity 2026), https://biologicaldiversity.org/campaigns/pesticides_reduction/atrazine/pdfs/Pernicious-Pesticide-report.pdf.

potable water to domestic households and commercial properties such as hotels, restaurants, and office buildings.

52. This September report, in addition to mapping the vast scope of nationwide atrazine pollution, identified five geographic areas in the U.S. with some of the highest levels of atrazine contamination: the Chesapeake Bay; the Midwest Corn Belt states of Kansas, Nebraska, Iowa, Missouri, Illinois, Indiana, and Ohio; Lake Okeechobee; the Lower Mississippi River; and the Texas Gulf Coast.

53. Additionally, according to the California Department of Pesticide Regulation, in 2023 California used over 17,000 pounds of atrazine on over 11,000 acres, mostly for corn and sorghum (sudangrass). For more than a decade, atrazine has been listed under California's Proposition 65 as a reproductive toxicant.[2] And on October 9, 2026, California issued a notice of intent to list atrazine under Proposition 65 as a carcinogen.[3]

54. On October 6, 2026, CBD's environmental health science director published a peer-reviewed study concluding that EPA's current efforts to reduce atrazine in waterways would allow continued contamination of water throughout the United States and needlessly delay water cleanup efforts.[4] Specifically, the report found that following implementation of EPA' s plan, "only 1% of the 11,248 contaminated watersheds in the United States would drop below the EPA-identified concentration that can harm aquatic ecosystems." *Id.*

55. CBD's September and October 2026 reports compiled information about water pollution that exceeds EPA's current level of acceptable pollution: 9.7 parts per billion (ppb),

---

[2] Cal. Off. Of Env't Health Hazard Assessment, *Atrazine, Propazine, Simazine and Their Chlorometabolites DACT, DEA and DIA Listed Effective July 15, 2016 as Reproductive Toxicants* (July 15, 2016), https://oehha.ca.gov/proposition-65/crnr/atrazine-propazine-simazine-and-their-chlorometabolites-dact-dea-and-dia-listed-effective-july-15.

[3] Cal. Off. Of Env't Heath Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism:* Atrazine (Oct 9, 2026), https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-chemicals-labor-code-mechanism-atrazine.

[4] Donley & Bradley, *Evaluating the effectiveness of EPA's proposed runoff mitigation plan on atrazine surfacewater concentrations in the United States*, 55 Journal of Environmental Quality e70274 (2026), https://doi.org/10.1002/jeq2.70274.

which is a level EPA has recognized causes harm to aquatic ecosystems. But exposure at levels as low as 0.1 ppb has been shown to harm reproductive organ development in frogs, potentially leading to population level impacts. The current allowable level of atrazine in human drinking water is 30 times higher than this, at 3 ppb. And California's public health goal for atrazine is 0.15 ppb, set by the Office of Environmental Health Hazard Assessment.

56. Accordingly, even the alarming results of CBD's 2026 reports likely underrepresent the severity of the dangers from atrazine in the nation's waters.

57. Moreover, none of the levels referenced in the preceding paragraphs were developed based on the Clean Water Act's mandates and standards for national recommended water quality criteria for aquatic life or human health.

**Halted Development of Water Quality Criteria for Atrazine**

58. EPA notified the public that it was beginning the process of developing atrazine water quality criteria more than 25 years ago. EPA began developing aquatic life criteria for atrazine in 1999. *See* 64 Fed. Reg. 58,409 (Oct. 29, 1999). Two years later, EPA published draft aquatic life criteria for atrazine and solicited comments on these criteria. *See* 66 Fed. Reg. 49,186 (Sept. 26, 2001) ("2001 Draft Criteria"); *see also* 66 Fed. Reg. 60,211 (Dec. 3, 2001) (extending comment period by 60 days). Two years after that, EPA published revised draft aquatic life criteria for atrazine and again solicited comments. *See* 68 Fed. Reg. 63,092 (Nov. 7, 2003) ("2003 Draft Criteria"). Two years after that, EPA indicated it was developing human health criteria for atrazine. *See* 70 Fed. Reg. 60,078 (Oct. 14, 2005).

59. EPA acknowledged "concerns" about atrazine, an herbicide used "throughout the U.S. for control of weeds in agricultural crops." 2003 Draft Criteria at 63094. EPA noted the many ways atrazine may contaminate the environment, both in its application as an herbicide but also from "industrial manufacture, distribution releases, precipitation, field runoff, and drift." *Id.* Because of its chemical properties, including its "resistan[ce] to natural degradation in water," EPA noted "potential risks posed by exposure of aquatic organisms to it." *Id.* Both the 2001 and

2003 Draft Criteria contained quantitative concentrations for both acute and chronic exposure for freshwater and saltwater environments. *Id*. In soliciting comments for a second (and apparently final) time, EPA sought only narrow input concerning use of one model and its applicability to both fresh and saltwater aquatic life, implying that its criteria were nearing its final form. *Id*. at 63,095.

60. On February 20, 2026, CBD sent a Freedom of Information Act ("FOIA") request to EPA's Office of Water, asking for any documents, other than the slim record contained in the public docket, covering the period of time between EPA's 2001 release of proposed atrazine aquatic life criteria (66 Fed. Reg. 49,186 (Sept. 26, 2001)) and its release of proposed revised criteria (68 Fed. Reg. 63,092 (Nov. 7, 2003)). CBD was informed that the agency had no responsive documents.

61. On September 18, 2026, CBD submitted a follow-up FOIA request, seeking documents between 2016 and present. CBD has not yet received a response from EPA.

62. On information and belief, EPA has taken no further action on developing and/or finalizing any water quality criteria for atrazine.

63. In the intervening years, atrazine is still used, still contaminates the environment, and still poses grave threats to humans and aquatic life. While the docket of EPA's rulemaking inexplicably went cold in 2003, the risks of atrazine endure, and the need for EPA to develop criteria to ensure these risks are addressed is more pressing than ever.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Clean Water Act)

### EPA's Failure to Comply with its Mandatory Duty to Issue Recommended Water Quality Criteria for Atrazine

64. Plaintiffs hereby incorporate by reference all preceding paragraphs.

65. The Clean Water Act requires that EPA "shall develop and publish, within one year after October 18, 1972 (and from time to time thereafter revise) criteria for water quality accurately

reflecting the latest scientific knowledge (A) on the kind and extent of all identifiable effects on health and welfare including, but not limited to, plankton, fish, shellfish, wildlife, plant life, shorelines, beaches, esthetics, and recreation which may be expected from the presence of pollutants in any body of water, including ground water; (B) on the concentration and dispersal of pollutants, or their byproducts, through biological, physical, and chemical processes; and (C) on the effects of pollutants on biological community diversity, productivity, and stability, including information on the factors affecting rates of eutrophication and rates of organic and inorganic sedimentation for varying types of receiving waters." 33 U.S.C. § 1314(a)(1).

66. EPA published draft aquatic life criteria for atrazine and solicited comments on these criteria. *See* 66 Fed. Reg. 49,186 (Sept. 26, 2001).

67. EPA published revised draft aquatic life criteria for atrazine and again solicited comments. *See* 68 Fed. Reg. 63,092 (Nov. 7, 2003).

68. Two years after that, EPA indicated it was developing human health criteria for atrazine. *See* 70 Fed. Reg. 60,078 (Oct. 14, 2005).

69. EPA has never developed or published final atrazine criteria for the protection of aquatic life or human health.

70. Accordingly, EPA is in violation of its mandatory duty under Clean Water Act section 304(a), 33.U.S.C. § 1314 (a).

**SECOND CLAIM FOR RELIEF (in the Alternative)**
**(APA)**

**EPA's Failure to Issue Atrazine Water Quality Criteria is an Agency Action Unreasonably Delayed or Unlawfully Withheld**

71. Plaintiffs hereby incorporate all preceding paragraphs by reference.

72. The APA requires that all federal agencies address matters "within a reasonable time," and "[w]ith due regard for the convenience and necessity of the parties or their representatives." 5 U.S.C. § 555(b).

73. The APA empowers reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

74. EPA published draft aquatic life criteria for atrazine and solicited comments on these criteria. *See* 66 Fed. Reg. 49,186 (Sept. 26, 2001).

75. EPA published revised draft aquatic life criteria for atrazine and again solicited comments. *See* 68 Fed. Reg. 63,092 (Nov. 7, 2003).

76. Two years after that, EPA indicated it was developing human health criteria for atrazine. *See* 70 Fed. Reg. 60,078 (Oct. 14, 2005).

77. EPA has never developed or published final atrazine criteria for the protection of aquatic life or human health.

78. Accordingly, EPA's failure to do so constitutes an agency action unreasonably delayed or unlawfully withheld, pursuant to the APA, 5 U.S.C. § 706(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that EPA has violated its mandatory duty to develop and publish water quality criteria for atrazine for the protection of aquatic life and human health pursuant to Clean Water Action section 304(a), 33 U.S.C. § 1314(a);

2. Alternatively, declare that EPA's delay in developing and publishing Clean Water Act 304(a) criteria for the protection of aquatic life and human health is an agency action unlawfully withheld or unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1);

3. Order EPA to develop Clean Water Act section 304(a) criteria "accurately reflecting the latest scientific knowledge," 33 U.S.C. § 1314(a)(1), for both aquatic life and human health, with enforceable dates certain for proposed and final rulemaking, taking into consideration EPA's Endangered Species Act obligation to consult with expert fish and wildlife agencies before finalizing water quality criteria;

4. Maintain jurisdiction over this action until EPA complies with the Clean Water Act, the APA, and every order of this Court;

5. Award Plaintiffs their reasonable attorneys' fees, costs, and expenses; and

6. Grant Plaintiffs such additional and further relief as the Court may deem just and appropriate.

Respectfully submitted this 14th day of October 2026,

*/s/ Jonathan Evans*
Jonathan Evans (CSB No. 247376)
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Tel: (213) 598-1466
Email: jevans@biologicaldiversity.org

Allison LaPlante (OSB No. 023614)
(application for *pro hac vice* pending)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Tel: (503) 980-3408
Email: alaplante@biologicaldiversity.org

*Counsel for Plaintiffs*